# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **WILLIE M. MULLINS,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:09cv00021 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Willie M. Mullins, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2009). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Mullins protectively filed her application for SSI on September 30, 2006, alleging disability as of September 30, 2006,[1] based on anemia, hypertension, circulation difficulties and lupus affecting her bones. (Record, ("R."), at 90-95, 119.) The claim was denied initially and upon reconsideration. (R. at 56-58, 64-66.) Mullins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 69.) The ALJ held a hearing on February 21, 2008, at which Mullins was represented by counsel. (R. at 21-53.)

By decision dated May 30, 2008, the ALJ denied Mullins's claim. (R. at 11-20.) The ALJ found that Mullins had not engaged in any substantial gainful activity since September 30, 2006. (R. at 13.) The ALJ found that the medical evidence established that Mullins had severe impairments, namely degenerative joint disease, osteoarthritis, lumbar strain, lupus, hypertension and impaired intellectual functioning, but he found that Mullins's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-16.) The ALJ also found that Mullins had the residual functional capacity

---

[1]Mullins initially alleged an onset date of September 1, 1994, (R. at 90), but amended the onset date to September 30, 2006, at her hearing. (R. at 52.)

to perform simple, unskilled light[2] work. (R. at 16.) The ALJ found that Mullins had no past relevant work. (R. at 18.) Based on Mullins's age, education, lack of work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mullins could perform, including light jobs as a laundry worker, a laundry laborer, a garment folder and a housekeeper. (R. at 19.) Thus, the ALJ found that Mullins was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. § 416.920(g) (2009).

After the ALJ issued his decision, Mullins pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-4, 6.) Mullins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2009). The case is before this court on the Commissioner's motion for summary judgment filed July 17, 2009.[3]

## II. Facts

Mullins was born in 1956, (R. at 90), which, at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. §

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2009).

[3]Mullins did not file a motion for summary judgment.

416.963(d).  She has a tenth-grade education[4] and no past relevant work experience. (R. at 30, 119, 123.)  She testified that she did not attend special education classes. (R. at 28.)  Mullins testified at her hearing that she dropped out of the eleventh grade to get married and had received no educational training since that time.  (R. at 29-30.) She stated that she relied on her husband and sister for transportation because she never obtained a driver's license, noting she never wanted one and was too nervous to try to obtain one.  (R. at 31.)

Mullins testified that she had seen Dr. Cassell, her treating physician, for approximately 15 years and that, at the time of the hearing, she was seeing him every three months.  (R. at 30-31.)  She stated that Dr. Cassell was treating her for lupus, which affected all of her joints, impeding such activities as performing housework and brushing her hair.  (R. at 32.)  She stated that she was taking Plaquenil for the lupus, which controlled it "a little bit," noting that she still had joint pain.  (R. at 32.) Mullins also testified that she had experienced blood clots in her right leg, for which a filter had been placed in her stomach, arthritis in the right knee and a previously broken left ankle.  (R. at 33.)  She stated that she had difficulty going up and down stairs due to pain, and she stated that walking on level ground made her legs "real tired" and numb and made her feel nauseated.  (R. at 33-34.)  Mullins testified that she did not use any assistive devices for walking, nor did she have a handicap parking tag. (R. at 34.)  She stated that she got relief from the leg pain by propping her feet up, which she sometimes had to do "about all day."  (R. at 34-35.)  Mullins further testified that she experienced swelling of the hands, stating that she had to massage them in the mornings, and that she had a "real bad esophagus," an ulcer and a hernia,

---

[4]Although Mullins indicated on her Disability Report that she completed the eleventh grade, (R. at 123), she testified at her hearing that she completed the tenth grade.  (R. at 27-29.)

which also caused her problems upon which she did not elaborate. (R. at 35, 37.)

Mullins testified that she experienced depression and problems with her "nerves," noting that she did not want to be around people. (R. at 35-36.) She stated that she attended church services, but her husband did the shopping for her. (R. at 36.) Mullins also testified that she had difficulty understanding written material, but liked to work crossword puzzles. (R. at 36-38.) She testified that her husband had always handled the household finances, and she stated that she performed housework, but "very slow[ly.]" (R. at 38-39.) She stated that she had not been on any trips or vacations in the previous two years, that she did not have a computer at home, that she watched television and sometimes rented movies. (R. at 40.) Mullins testified that she was not under the care of a psychiatrist or counselor. (R. at 40.)

Vocational expert, James Williams, also was present and testified at Mullins's hearing. (R. at 41-51.) He was asked to consider a hypothetical individual of the same age, education and lack of work history as Mullins, who could perform light work with an occasional ability to climb stairs and ramps, to kneel and to crawl, no ability to climb ladders, ropes or scaffolds and a frequent ability to balance, to stoop and to crouch. (R. at 43-44.) This hypothetical individual also should avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights and would be limited to the performance of simple, unskilled work that required no more than minimal interaction with the public. (R. at 44.) Williams testified that such an individual could perform the jobs of a laundry folder, a laundry laborer, a garment folder and a housekeeper, all existing in significant numbers in the national economy. (R. at 45.) Williams testified that the reading level required to perform such jobs would be at the lowest level. (R. at 46.)

Williams next was asked to consider a hypothetical individual of Mullins's age, education and lack of work history, who could lift items weighing up to 10 pounds, who could stand and/or walk for no more than two hours in an eight-hour workday, who could sit for no more than six hours in an eight-hour workday with the ability to periodically alternate between sitting and standing to relieve pain, who should never climb ramps, stairs, ladders, ropes or scaffolds, who could occasionally balance, kneel and stoop, who could never crouch or crawl, who could occasionally reach, handle, finger and feel and who should avoid temperature extremes, dust, vibrations, hazards, fumes, odors, chemicals and gases. (R. at 46.) Williams testified that such an individual could perform only a very limited number of sedentary[5] jobs, including those of a call operator and a security surveillance monitor. (R. at 47.) When asked about the same individual, but who also would miss, on average, between one and three days of work weekly, Williams testified that competitive employment at any exertional level would essentially be precluded. (R. at 47.)

Williams next was asked to consider a hypothetical individual who had an unsatisfactory ability to interact appropriately with the public, supervisors and co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting. (R. at 48.) Williams testified that such an individual could not perform any jobs. (R. at 48.) He further testified that each Dictionary of Occupational Titles, ("DOT"), number has a specific math and language and reasoning level attached to it, denoted by level one through

---

[5]Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. 416.967(a) (2009).

three. (R. at 50.) He stated that an individual who possessed only a third-grade level ability in these areas would have difficulty performing jobs classified in the DOT even as level one, which denotes entry level. (R. at 50.)

In rendering his decision, the ALJ reviewed records from Virginia Public Schools; Dr. Jerry F. London, M.D., a gastroenterologist; Dr. David Countryman, M.D.; Dr. Todd A. Cassell, M.D.; Johnston Memorial Hospital; Dr. William H. Humphries, M.D.; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Joseph Duckwall, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Holston Valley Hospital.

On September 29, 2006, Mullins participated in a Life Line Screening examination, which revealed that she was at high risk for bone diminishment. (R. at 182-89.) She was advised to see her physician. (R. at 184.)

Mullins saw Dr. Todd A. Cassell, M.D., from August 15, 2006, through November 27, 2006. (R. at 206-07, 254.) On August 15, 2006, Dr. Cassell noted that Mullins had improved from her last visit, but she had some "ups and down moods, some pains in her legs at times." (R. at 206.) He noted that she looked well. (R. at 206.) Mullins was diagnosed with lupus, hypertension and depression. (R. at 206.) On October 11, 2006, Mullins presented with complaints of having sprained her left ankle two days previously. (R. at 206.) The foot was diffusely swollen, but the ankle was "okay and stable." (R. at 206.) There was tenderness at the base of the fourth and fifth metatarsal areas. (R. at 206.) X-rays revealed possible degenerative changes and a fracture of the fifth metatarsal. (R. at 206, 211-12.) On October 16, 2006, Mullins

was placed in a short leg cast. (R. at 207.) By November 13, 2006, she stated that her foot was "still [a] little sore." (R. at 207.) Dr. Cassell diagnosed hypertension, lupus, foot fracture and depression. (R. at 207.) On November 27, 2006, the cast was removed, and Dr. Cassell noted that the fracture was stable. (R. at 254.) He advised Mullins to slowly increase weightbearing and activities as tolerated. (R. at 254.)

X-rays of Mullins's knees, taken on December 19, 2006, revealed mild femorotibial joint space narrowing of the left knee and marked medial compartmental joint space narrowing of the right knee. (R. at 215-16.) X-rays of the lumbar spine were normal. (R. at 217.) The same day, Dr. William Humphries, M.D., completed a physical examination at the request of Disability Determination Services based on Mullins's lupus diagnosis. (R. at 218-22.) She reported that she was diagnosed with lupus in 1993 and that she experienced joint aches and pains and swelling, particularly in the lower extremities, including the hips, knees, ankles and feet. (R. at 218.) She reported experiencing pain most of the time, which was worsened by standing, walking and bending. (R. at 218.) Mullins also complained of low back pain for the previous six years, worsened by bending, picking up objects and standing. (R. at 218.) She noted that she had experienced no bowel or bladder difficulties and had required no surgery or injections for this condition. (R. at 218.) Mullins reported a history of blood clots of the legs, for which she was hospitalized in 2000 for placement of a filter. (R. at 218.) She was in no distress and related well to Dr. Humphries. (R. at 219.) Neck range of motion was within normal limits, no paravertebral muscle spasms were appreciated, and straight leg raise testing was negative to 90 degrees sitting bilaterally. (R. at 219.) Mullins had full range of motion of the upper extremities without tenderness, swelling or deformity, except for some mild synovial thickening of some of the interphalangeal, ("IP"), joints of the

fingers of both hands.  (R. at 219.)  Range of motion of the lower extremities was slightly reduced in both hips, both knees and the left ankle.  (R. at 219.)  However, no specific tenderness to palpation of the lower extremity joints was noted.  (R. at 219.)  Dr. Humphries further noted some mild synovial thickening of some of the metatarsophalangeal, ("MTP"), joints and IP joints of the toes of both feet.  (R. at 219-20.)

Mullins was able to get on and off of the examination table without difficulty, and her grip strength was 4.5 out of 5 bilaterally.  (R. at 220.)  Radial, median and ulnar nerve functions were intact bilaterally, and her gait was within normal limits.  (R. at 220.)  Mullins was able to heel and toe walk with assistance for balance, and she could bear weight on both legs, with normal strength in all four extremities.  (R. at 220.)  No specific muscle wasting was noted, and there was no motor or sensory loss of the extremities.  (R. at 220.)  Deep tendon reflexes were trace to 1+ and equal in both upper extremities, 1+ and equal in the knees and 1+ and equal in the ankles.  (R. at 220.)

Mullins was alert and fully oriented, her thought and idea content were within normal limits, and her memory was borderline adequate for recent and remote events.  (R. at 220.)  Dr. Humphries opined that her intelligence was within the low normal range, and he noted that her affect was slightly flat.  (R. at 220.)  He diagnosed lupus, by history, with multiple lower extremity arthralgias, chronic lumbar strain, posttraumatic degenerative joint disease of the left ankle and  mild degenerative joint disease of both hands and feet.  (R. at 220-21.)  Dr. Humphries opined that Mullins

could perform medium work[6] diminished by an occasional ability to kneel and to crawl.  (R. at 221.)

On December 28, 2006, Dr. Richard Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Mullins could perform medium work.  (R. at 228-35.)  He further found that she could occasionally climb, kneel and crawl.  (R. at 230.)  Although Dr. Surrusco imposed no manipulative, visual or communicative limitations, he found that Mullins should avoid concentrated exposure to hazards, such as machinery and heights.  (R. at 230-31.) Mullins's statements were deemed to be partially credible.  (R. at 235.)

On January 9, 2007, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), indicating that Mullins suffered from a nonsevere anxiety-related disorder.  (R. at 237-50.)  Tenison did not complete the portion of the PRTF relating to the Rating of Functional Limitations.  (R. at 247.)  However, he opined that Mullins's mental allegations were not fully credible, and he found that her mental limitations appeared to be slight.  (R. at 250.)

Mullins again saw Dr. Cassell on February 26, 2007, at which time she complained of intermittent, mild fatigue, diffuse muscle aches and diffuse arthralgias without swelling.  (R. at 252-53.)  She again reported no change in bowel or bladder habits, but she noted that her legs continued to get very tired from the thighs down, causing her to have to rest when walking.  (R. at 252.)  Physical examination revealed

---

[6]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. 416.967(c) (2009).

that Mullins was in no acute distress, and she was alert and oriented. (R. at 252.) There was no clubbing or edema of the lower extremities and no tenderness at the lateral epicondyle, as well as no heat or swelling of any joints. (R. at 252.) Dr. Cassell diagnosed lupus, benign hypertension and epicondylitis. (R. at 252-53.) He noted that her leg weakness, fatigue and aches sounded like lumbar stenosis. (R. at 253.) Mullins declined an elbow injection. (R. at 253.)

Dr. Joseph Duckwall, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on April 4, 2007, finding that Mullins could perform medium work, diminished by an occasional ability to climb, to kneel and to crawl. (R. at 258-65.) He imposed no manipulative, visual or communicative limitations. (R. at 260-61.) Dr. Duckwall found that Mullins should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 261.) He deemed Mullins's statements to be partially credible. (R. at 265.)

On April 11, 2007, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding that Mullins suffered from a nonsevere affective disorder and anxiety-related disorder, namely depression and anxiety. (R. at 266-79.) Leizer opined that Mullins was mildly restricted in her activities of daily living and that she experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 276.) He found that Mullins had experienced no episodes of decompensation. (R. at 276.) Leizer deemed Mullins's mental allegations not fully credible, opining that her mental limitations appeared to be slight. (R. at 279.)

Mullins saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on

April 30, 2007, for a psychological evaluation. (R. at 282-89.) A review of Mullins's school records revealed a history of retention and social promotion in school. (R. at 284.) Lanthorn noted that Mullins's standardized achievement test scores were consistently low. (R. at 284.) Lanthorn also noted that Mullins underwent two group administered IQ tests, one at the age of eight, which revealed an IQ of 75, and one at the age of seven, which revealed an IQ of 73. (R. at 284.)

Mullins described a typical day to include trying to clean her house, but having to take breaks because her legs and back would get "real tired" and hurt. (R. at 285.) She reported helping with laundry, cooking some, occasionally going to the grocery store with her husband, regularly attending church services, socializing with her family and sometimes watching television. (R. at 285.) Lanthorn noted that Mullins had never received psychiatric or psychotherapeutic treatment despite her report of significant "nerve problems." (R. at 285.) Specifically, she reported significant depression, noting that she had been depressed for more than 20 years off and on. (R. at 285.) Mullins stated that she preferred to be alone and had to force herself to socialize. (R. at 285.) She reported a poor short-term memory and highly variable concentration, ranging from erratic to poor. (R. at 285.) In addition to depression, Mullins also reported anxiety, manifested by shakiness and agitation. (R. at 285.)

Lanthorn described Mullins's mood as euthymic. (R. at 285.) She was fully oriented, denied hallucinations and showed no signs or symptoms of delusional thinking. (R. at 285.) Lanthorn further noted no clinical evidence of psychotic processes and that her thinking was very concrete in nature. (R. at 285.) Lanthorn noted that, during testing, it was evident that it was difficult for Mullins to persist at tasks effectively, although she made a good faith effort. (R. at 285.)

Lanthorn administered the Wechsler Adult Intelligence Scale-Third Edition, ("WAIS-III"), test, on which Mullins achieved a verbal IQ score of 66, a performance IQ score of 63 and a full-scale IQ score of 62, placing her in the extremely low range of current intellectual functioning. (R. at 286.) Lanthorn also administered the Wide Range Achievement Test-Third Edition, ("WRAT3"), on which Mullins achieved a third-grade reading score and arithmetic score and a fourth-grade spelling score. (R. at 287.) Lanthorn opined that Mullins's WAIS-III and WRAT3 results were valid and accurately reflected her current degree of intellectual functioning. (R. at 285-86.) Lanthorn also administered the Pain Patient Profile, ("P/3"), the results of which he deemed valid. (R. at 287.) Mullins scored in the most extreme level on the anxiety scale, the depression scale and the somatization scale. (R. at 287.) Although Lanthorn administered the Personality Assessment Inventory, ("PAI"), he opined that Mullins did not generate a valid profile, likely due to her very limited reading skills. (R. at 288.)

Lanthorn diagnosed Mullins with a pain disorder associated with both psychological factors and general medical conditions, chronic; major depressive disorder, recurrent, moderate to severe; anxiety disorder, not otherwise specified; mild mental retardation; and a then-current Global Assessment of Functioning, ("GAF"), score of 40-45.[7] (R. at 288.) He opined that she was able to manage her own funds,

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 31 to 40 indicates that the individual has "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. . . ." DSM-IV at 32. A GAF score of 41 to 50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

and he rated her psychological prognosis as being between guarded and poor. (R. at 288.) Based on Mullins's educational history, coupled with the psychological evaluation, Lanthorn opined that Mullins had suffered from mild mental retardation throughout her lifetime, extending back to her school years. (R. at 288-89.) He noted that she had very limited academic/educational skills and only marginally read and performed arithmetic at the third-grade level. (R. at 289.) He further noted that her thinking was very concrete in nature, that she experienced moderate to severe depression, anxiety, insomnia, chronic pain and limitations, difficulties with short-term memory, with concentration and with initiating and completing tasks. (R. at 289.) Lanthorn recommended that Mullins consider seeking mental health counseling, particularly a psychiatric evaluation to ascertain the efficacy of her current psychotropic medications, which, he opined, did not appear to be having the desired effect. (R. at 289.)

Lanthorn concluded that Mullins would find it extremely difficult to sustain a 40-hour workweek, even with simple and repetitive tasks, given that she was quite socially withdrawn, had limited academic/educational skills and suffered from chronic pain syndrome. (R. at 289.)

Lanthorn also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental). (R. at 280-81.) He found that Mullins was moderately limited in her ability to understand, remember and carry out short, simple instructions, markedly limited in her ability to make judgments on simple work-related decisions, to interact appropriately with the public, to interact appropriately with supervisors, to interact appropriately with co-workers, to respond appropriately to work pressures in a usual work setting and to respond appropriately to changes in a routine work setting

and extremely limited in her ability to understand, remember and carry out detailed instructions.  (R. at 280-81.)

Mullins again saw Dr. Cassell on June 29, 2007, for a regular checkup.  (R. at 290-91.)  She continued to complain of stiffness all over and continued foot pain.  (R. at 290.)  Physical examination revealed that Mullins was in no acute distress, she had no swelling or visible change of the left foot and no localized tenderness to compression or palpation. (R. at 290.)  X-rays of the right foot revealed probable osteoarthritis and a calcaneal spur.  (R. at 294.)  Dr. Cassell diagnosed lupus, gammopathy,[8] benign hypertension and arthropathy of the ankle and foot, not otherwise specified.  (R. at 290-91.)  On July 3, 2007, Mullins was notified that her inflammation rate was "a little elevated."  (R. at 296.)  She was advised to continue her medications.  (R. at 296.)

On July 24, 2007, Dr. Cassell completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical).  (R. at 297-300.)  He found that Mullins could lift and/or carry items weighing less than 10 pounds both occasionally and frequently, that she could stand and/or walk less than two hours in an eight-hour workday and that she could sit for less than six hours in an eight-hour workday, but must periodically alternate between sitting and standing.  (R. at 297-98.)  Dr. Cassell further opined that Mullins could occasionally balance, kneel and stoop, but could never climb, crouch or crawl.  (R. at 298.)  Additionally, Dr. Cassell found that Mullins was limited to occasionally reaching in all directions, but could handle, finger and feel objects.  (R. at 299.)  Finally, Dr. Cassell found that Mullins was limited in

---

[8]Gammopathy refers to a condition marked by disturbed immunoglobulin synthesis. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 674 (27th ed. 1988).

her ability to work around temperature extremes, dust, vibration, hazards, such as machinery and heights, and fumes, odors, chemicals and gases. (R. at 300.) He opined that the cumulative impact of Mullins's problems would cause her to miss one to three days of work per week. (R. at 300.)

The same day, Dr. Cassell completed a Clinical Assessment Of Pain with regard to Mullins, finding that pain was present to such an extent as to be distracting to the adequate performance of daily activities or work, that physical activity, such as walking, standing and bending greatly increased her pain, causing abandonment of tasks related to daily activities or work and that medication impacted Mullins's work ability to the extent that some limitations were present, but would not create serious work problems. (R. at 301.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is

unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2009); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 30, 2008, the ALJ denied Mullins's claim. (R. at 11-20.) The ALJ found that the medical evidence established that Mullins had severe impairments, namely degenerative joint disease, osteoarthritis, lumbar strain, lupus, hypertension and impaired intellectual functioning, but he found that Mullins's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-16.) The ALJ also found that Mullins had the residual functional capacity to perform simple, unskilled light work. (R. at 16.) Based on Mullins's age, education, lack of work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Mullins could perform, including light jobs as a laundry worker, a laundry laborer, a garment folder and a housekeeper. (R. at 19.) Thus, the ALJ found that Mullins was not under a disability as defined under the Act, and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. § 416.920(g).

Mullins argues that the ALJ erred in his residual functional capacity finding. (Brief In Support Of Plaintiff's Motion For Remand, ("Plaintiff's Brief"), at 3-4.)

Mullins also argues that the ALJ erred by failing to find that her condition met the requirements for mental retardation, found at 20 C.F.R. Part 404, Subpart P § 12.05C. (Plaintiff's Brief at 4-7.)

The ALJ in this case found that Mullins had the residual functional capacity to perform simple, unskilled light work. (R. at 16.) Based on my review of the record, I find that substantial evidence exists to support this finding. Mullins argues that the ALJ erred in his residual functional capacity finding by failing to address the findings of Drs. Humphries and Cassell pertaining to her legs and feet. She further argues that the ALJ erred by failing to afford greater weight to the opinions of her treating physician, Dr. Cassell. Based on my review of the record, I find that substantial evidence exists to support the ALJ's residual functional capacity finding.

In July 2007, Dr. Cassell opined that Mullins could lift items weighing less than 10 pounds on both a frequent and occasional basis, and he found that she could stand and/or walk for less than two hours in an eight-hour workday due to her description of a lumbar stenosis type problem in her history, which would limit her walking and standing, and which seemed to produce pressure on the nerves of her lower limbs. (R. at 297-98.) However, Dr. Cassell further noted that he had been unable to verify this. (R. at 298.) Dr. Cassell also stated that he imposed such restrictions due to some limitation of her upper and lower joints due to lupus. (R. at 298.) Thus, these severe restrictions appear to have been imposed largely based on Mullins's subjective complaints. Additionally, Dr. Cassell's findings are not supported by the record as a whole and are inconsistent with his own treatment notes. For instance, x-rays of Mullins's lumbar spine, taken on December 19, 2006, yielded normal results. (R. at 217.) The only other physical examination documented in the record, aside from

those performed by Dr. Cassell, also revealed relatively benign findings, including no motor or sensory deficits, negative straight leg raise testing, normal gait, normal strength of the lower extremities, only a slightly reduced range of motion of the lower extremities, including the hips, knees and left ankle, no specific tenderness to palpation of the lower extremities and some mild synovial thickening of some of the MTP and IP joints of the toes of both feet. (R. at 219-20.) Moreover, there is no evidence in the record that Mullins required an assistive device for walking. Despite an x-ray of the knees, taken on December 19, 2006, showing mild joint space narrowing of the left knee and marked joint space narrowing of the right knee, Dr. Cassell placed no restrictions on Mullins's physical activities. (R. at 215-16.) Additionally, treatment of Mullins's lower extremity impairments has been conservative in nature, and it appears that her conditions are relatively stable with medications. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling[]"). Finally, the state agency physicians, who considered all of Mullins's medical record in reaching their conclusions, found that she could perform less than the full range of medium work. (R. at 228-35, 258-65.)

Furthermore, the significant restrictions imposed by Dr. Cassell are inconsistent with his own treatment notes. From August 15, 2006, through July 3, 2007, Dr. Cassell's treatment notes show that Mullins suffered a fractured metatarsal of the left foot, and she was diagnosed with lupus, possible degenerative changes of the left ankle, epicondylitis, gammopathy and arthropathy of the ankle and foot, not otherwise specified. (R. at 206-07, 211-12, 252-53, 290-91.) Despite these diagnoses, Dr. Cassell never placed any restrictions on Mullins's physical activities, with the exception of advising her to slowly increase weightbearing and activities as tolerated

in November 2006, following the removal of the cast from her foot.  (R. at 254.)  At that time, Dr. Cassell noted that Mullins's fracture was stable.  (R. at 254.)  Moreover, a physical examination performed by Dr. Cassell on February 26, 2007, showed no clubbing or edema of the lower extremities and no heat or swelling of any joints.  (R. at 252.)  Likewise, on June 29, 2007, physical examination revealed that Mullins was in no acute distress, she had no swelling or visible change of the left foot and no localized tenderness to compression or palpation of the left foot.  (R. at 290.)

For all of the above-stated reasons, I find that substantial evidence supports the ALJ's physical residual functional capacity finding.  For the reasons that follow, I also find that substantial evidence supports the ALJ's finding that Mullins's mental impairment does not meet the criteria for the listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, § 12.05C.

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant."  However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered."  *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983).  In *Townsend*, the court also noted that the antonym of "significant" is "meaningless."  *See* 581 F. Supp. at 159.  The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in

the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2009); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

IQ testing performed by psychologist Lanthorn revealed a verbal IQ score of 66, a performance IQ score of 63 and a full-scale IQ score of 62, scores that Lanthorn opined were valid. (R. at 286.) Thus, Mullins meets the first prong of § 12.05C. Next, in order to meet the criteria of § 12.05C, Mullins must show a physical or other mental impairment imposing additional and significant work-related limitation of function. I find that she has done so. Specifically, the ALJ found that Mullins had the following severe impairments: degenerative joint disease, osteoarthritis, lumbar strain, lupus, hypertension and impaired intellectual functioning. The Fourth Circuit held in *Evans v. Heckler*, that "[A]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)). That being the case, I find that the ALJ's finding that Mullins suffered from the above-listed severe impairments shows that she suffered from "a physical or other mental impairment imposing additional and significant work-related limitation of function," thereby meeting the second prong of § 12.05C.

Finally, the introductory paragraph to § 12.05C makes it clear that mental retardation is a lifelong, and not acquired, disability. *See Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 5975, at *10 (W.D. Va. Apr. 8, 2005). Thus, to qualify as disabled

under this listing, a claimant also must demonstrate that she has had deficits in adaptive functioning that began during childhood. That being the case, I must determine whether substantial evidence supports a finding that Mullins's impairment did not manifest itself during the developmental period, i.e., before age 22. I find that substantial evidence does exist in this record to support this finding. Despite Mullins's argument that the ALJ improperly considered test scores from the Kuhlmann-Anderson Test, administered when she was seven and eight years old, to be IQ scores, I find that the court need not resolve this particular issue since, as the Commissioner argues in his brief, IQ scores are not necessary to determining whether an individual suffered from deficits in adaptive functioning beginning in childhood. *See Justice v. Barnhart*, 431 F. Supp. 2d 617, 619-20 (W.D. Va. 2006) (holding that low IQ can support a finding of manifestation of deficits in adaptive functioning prior to age 22, but does not conclusively establish such deficits for purposes of a Social Security disability claim). Moreover, a plaintiff's current IQ score presumptively would be her IQ score before she was 22. *See Luckey v. U.S. Dep't of Health & Human Servs.*, 890 F.2d 666, 668 (4th Cir. 1989) (stating that a person's IQ is considered to remain relatively constant throughout her life, absent evidence of a change in a person's intelligence functioning). As the court in *Justice* stated, "IQ alone . . . does not establish that [a claimant] manifested deficits in adaptive functioning before age 22 because the Commissioner could arguably rebut that assertion or [a claimant's] claim of mental impairment itself." 431 F. Supp. 2d at 620. Moreover, giving Mullins the benefit of the doubt that the Kuhlmann-Anderson Test does not constitute an IQ test and, therefore, discarding these scores from consideration, I, nonetheless, am of the opinion that Mullins's mental impairment does not meet the criteria of § 12.05C. Specifically, even taking the IQ scores from the WAIS-III test administered by

Lanthorn, and even giving Mullins the benefit of the doubt that her IQ scores would have been the same prior to age 22, *see Luckey*, 890 F.2d at 668, I still find, for the following reasons, that substantial evidence exists to support a finding that Mullins does not meet the requisite criteria set forth in the introductory paragraph to § 12.05C.

In *Moon v. Astrue*, 2009 WL430434, at *7 (W.D. Va. Feb. 20, 2009) (quoting DSM-IV at 42), "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Despite Mullins's history of poor grades in school, failure of the first grade and "social promotion" following her third, fourth and fifth grade years, the District Court for the Western District of Virginia has held that "[g]rades and IQ scores, without more, do not prove how effectively individuals cope with common life demands and how well they meet the expected standards of personal independence." *Moon*, 2009 WL 430434, at *7 (citing DSM-IV at 42). Here, I find that substantial evidence supports the ALJ's finding that the record does not reflect significant deficits in Mullins's adaptive functioning manifested before age 22. First, on a Function Report, dated October 27, 2006, Mullins reported that she could perform personal care, albeit at a slower pace due to fatigue. (R. at 108.) She further reported that she was able to cook "complete meals" daily, wash clothes and shop weekly for about an hour and a half. (R. at 108-10.) Mullins stated that she could pay bills, count change, handle a savings account and use a checkbook. (R. at 110.) She listed her hobbies to include reading, watching television and listening to the radio daily. (R. at 111.) She stated that she could do these activities "ok." (R. at 111.) At the administrative hearing, Mullins reported that she enjoyed working crossword

puzzles, despite her limited reading skills. (R. at 37-38.) Also on the Function Report, Mullins noted that she attended church services weekly, and she stated that she had no difficulty getting along with others. (R. at 111-12.) She did not report difficulty with memory, understanding or following written or spoken instructions. (R. at 112.) Mullins reported that she handled changes in routine "ok." (R. at 113.) She completed this Function Report without assistance. (R. at 115.) Finally, at the administrative hearing, it does not appear that Mullins had any difficulty understanding and answering the questions asked of her by her attorney or by the ALJ.

For all of the above-stated reasons, I find that substantial evidence supports a finding that Mullins did not suffer from deficits in adaptive functioning prior to the age of 22. That being the case, I find that substantial evidence supports the ALJ's finding that Mullins's mental impairment does not meet the criteria of the listed impairment for mental retardation, found at 20 C.F.R. Part 404, Subpart P, § 12.05C.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.    Substantial evidence exists to support the ALJ's weighing of the evidence and findings with regard to Mullins's physical residual functional capacity;

2.    Substantial evidence exists to support the ALJ's finding that Mullins's mental impairment does not meet the criteria of the listed impairment for mental retardation, found at 20 C.F.R. Part 404, Subpart P, § 12.05C; and

3.      Substantial evidence exists to support the ALJ's finding that Mullins was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2009):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the

Honorable James P. Jones, Chief United States District Judge.

     The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

     DATED:    This 11th day of March 2010.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE